

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 2-09-214-CV

IN THE INTEREST OF Z.D.G.
AKA Z.D.S., A CHILD

------------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I.  Introduction

In twelve issues, Appellant Father appeals the termination of his parental rights to Z.D.G., challenging the legal and factual sufficiency of the evidence to support the jury's endangerment and best interest findings.[2]  We affirm.

### II.  Termination of Parental Rights

---

[1] *See* Tex. R. App. P. 47.4.

[2] Mother does not appeal the termination of her parental rights to Z.D.G.

Father complains that the evidence is legally and factually insufficient to support termination of his parental rights under subsections (D) or (E) of family code section 161.001(1)[3] and to support the best interest finding under section 161.001(2). *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (2) (Vernon Supp. 2009).

## A. Standard of Review

In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (Vernon 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re M.C.T.*, 250 S.W.3d 161, 167 (Tex. App.—Fort Worth 2008, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based

---

[3] Although Father also appears to challenge the sufficiency of the evidence to support termination of his parental rights under section 161.001(1)(O), his rights were not terminated on this ground.

solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. §§ 161.001, 161.206(a) (Vernon 2008). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (Vernon 2008). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

### 1. Legal Sufficiency

In reviewing the evidence for legal sufficiency in parental termination cases, we must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We must review all the evidence in the light most favorable to the finding and judgment. *Id.* This means that we must assume that the factfinder resolved any disputed facts in favor of its finding if a reasonable factfinder could have done so. *Id.* We must also disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We must consider, however, undisputed evidence even if it is contrary to the finding. *Id.* That is, we

must consider evidence favorable to termination if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We must therefore consider all of the evidence, not just that which favors the verdict. *Id.* But we cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we must defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

### 2. Factual Sufficiency

In reviewing the evidence for factual sufficiency, we must give due deference to the factfinder's findings and not supplant the verdict with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We must determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated subsections (D) or (E) of section 161.001(1) and that the termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

### B. Endangerment

4

Section 161.001(1)(D) requires a finding that the parent knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endanger the physical or emotional well-being of the child. Tex. Fam. Code Ann. § 161.001(1)(D). Section 161.001(1)(E) requires a finding that the parent engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangers the physical or emotional well-being of the child. *Id.* § 161.001(1)(E).

Endangerment is defined as exposing to loss or injury, to jeopardize. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Under subsection (D), it is necessary to examine evidence related to the environment of the child to determine if the environment was the source of endangerment to the child's physical or emotional well-being. *In re D.T.*, 34 S.W.3d 625, 632 (Tex. App.—Fort Worth 2000, pet. denied). A child is endangered when the environment creates a potential for danger that the parent is aware of but disregards. *See In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in his home is a part of the "conditions or surroundings" of the child's home under section 161.001(1)(D). *Castorena v. Tex. Dep't of Protective & Regulatory Servs.*, No. 03-02-00653-CV, 2004 WL 903906, at *8 (Tex. App.—Austin Apr. 29, 2004, no pet.) (mem. op.); *see also In re W.S.*, 899 S.W.2d 772, 776 (Tex. App.—Fort Worth 1995, no writ) (stating

5

that "environment" refers not only to the acceptability of living conditions, but also to a parent's conduct in the home).

Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical or emotional well-being was the direct result of the parent's conduct, including acts, omissions, and failures to act. *J.T.G.*, 121 S.W.3d at 125. Termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *Id.*; *D.T.*, 34 S.W.3d at 634.

To determine whether termination is necessary, courts may look to parental conduct occurring both before and after the child's birth. *In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.). The factfinder may infer from past conduct endangering the child's well-being that similar conduct will recur if the child is returned to the parent. *See In re D.L.N.*, 958 S.W.2d 934, 941 (Tex. App.—Waco 1997, pet. denied), *disapproved on other grounds by J.F.C.*, 96 S.W.3d at 267 n.39, *and C.H.*, 89 S.W.3d at 26. Drug abuse during pregnancy constitutes conduct that endangers a child's physical and emotional well-being. *See In re W.A.B.*, 979 S.W.2d 804, 806–07 (Tex. App.—Houston [14th Dist.] 1998, pet. denied), *disapproved of on other grounds, J.F.C.*, 96 S.W.3d at 267 n.39; *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 84 (Tex. App.—Dallas 1995, no writ). And "a parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct." *In re J.O.A.*, 283 S.W.3d

6

336, 345 & n.4 (Tex. 2009); *see also In re S.K.A.*, No. 10-08-00347-CV, 2009 WL 2645027, at *9 (Tex. App.—Waco Aug. 19, 2009, no pet.) (mem. op.) (holding that father's failure to take any action to protect unborn child from mother's drug use was sufficient to establish that he knowingly allowed the child to remain in conditions and surroundings that endangered the child's physical well-being); *In re M.J.M.L.*, 31 S.W.3d 347, 351–52 (Tex. App.—San Antonio 2000, pet. denied) (holding that evidence of course-of-conduct endangerment was legally sufficient when it showed that father knew mother was a drug addict who used drugs while pregnant and that he abandoned soon-to-be-born baby to her care); *Edwards v. Tex. Dep't of Protective & Regulatory Servs.*, 946 S.W.2d 130, 138 (Tex. App.—El Paso 1997, no writ) (holding that father's failure to take any action to protect the child from mother's drug abuse while pregnant was sufficient to establish that he knowingly allowed the child to remain in an endangering environment), *disapproved of on other grounds, J.F.C.*, 96 S.W.3d at 267 n.39. To support a finding of endangerment, the parent's conduct does not necessarily have to be directed at the child, nor is the child required to suffer injury. *Boyd*, 727 S.W.2d at 533.

### 1. Evidence

#### a. Z.D.G.'s Removal History

Mother, whose history with Child Protective Services ("CPS") involving her older two children began in 2006 and is set out in greater detail below, tested

positive for cocaine fifteen days before Z.D.G. was born on May 15, 2007.[4]  The

Department of Family and Protective Services ("DFPS") filed a petition for Z.D.G.'s

protection, removed Z.D.G. at the hospital, and placed her into foster care.  CPS

worker April Cumberbatch was initially assigned to the case and transferred it to

Katrina Lewis in August or September 2007. Terry Slife, Z.D.G.'s court-appointed

special advocate ("CASA"), was appointed to the case in August 2007.

On July 20, 2007, the trial court signed an order returning possession of

Z.D.G. to Mother and Father,[5] ordering Mother to submit to random drug testing and

quarterly hair follicle testing, ordering Father to sign a release to DFPS and CPS for

Tarrant County Probation Department's Urine Analysis results,[6] and ordering both

parents to allow DFPS and CPS access to Z.D.G.  By January 30, 2008, DFPS had

---

[4] Dr. Mark Scroggins, the obstetrician whose discovery of Mother's cocaine use via routine labwork led to Z.D.G.'s initial removal, testified that he first saw Mother five weeks before her due date.  He testified that cocaine can be fatal to a baby but that Z.D.G. was born healthy.

[5] A CPS worker explained to the jury the difference between temporary managing conservatorship and temporary possessory conservatorship as follows:

Basically, [DFPS] maintains custody of the child but we're placing the child back with parents on a monitored return just to see how everything is doing and whether or not the needs of the child are being met.  And the parents . . . have what we call possessory custody, but we retain the right to monitor that child inside the home and make sure that she is safe and also to determine whether or not it's appropriate . . . for her to remain in the home.

[6] Father was on deferred adjudication community supervision for a 2003 possession of a controlled substance offense (cocaine).

8

filed a motion to dismiss, having decided that "if everything was still going according to plan, [and] the mom was still testing negative, that [DFPS] would [close the case]."

But less than a week later, DFPS filed an emergency motion to modify possessory conservatorship, alleging an immediate danger to Z.D.G.'s physical health or safety because Mother's January 29, 2008 hair follicle tested positive for cocaine. Neil Fortner, a toxicologist, testified that hair follicle testing shows drug usage going back around ninety days—so from October 2007 to January 2008 for the January 29, 2008 test—and that the amount of cocaine that Mother's hair sample contained was relatively high at three times the amount needed to result in a positive test.[7] The trial court granted DFPS's motion, returned Z.D.G. to foster care, and gave Mother and Father supervised visitation with her at the CPS office for one hour a week.

On April 17, 2008, the trial court issued an order returning possession of Z.D.G. to Father and granting Mother reasonable supervised visits "as agreed upon by [DFPS]." Lewis testified that Father said "that he would comply with CPS requests that [Mother] have no unsupervised contact with [Z.D.G.]—that the contact would be supervised by CPS."

On May 28, 2008, DFPS filed another emergency motion to modify possessory conservatorship, alleging an immediate danger to Z.D.G.'s physical

---

[7] The cocaine content of Mother's hair from her February 26, 2008 hair follicle test—for the ninety days between November 2007 and February 2008—was even higher, suggesting continued and heavy use.

9

health or safety because of a May 24, 2008 disturbance involving Mother and Mother's mother ("Grandmother") at which Z.D.G. was present. Hurst Police Officer Brianne Dibley, who responded to the call, testified that when she spoke with Mother, Mother was clearly under the influence of drugs, that Mother admitted to having used methamphetamine for about a week and a half, and that Mother said Grandmother had bought the drugs.[8] Mother retrieved her drug pipe from the apartment floor and handed it to Officer Dibley, and there were signs of a domestic dispute, including broken glass, at Grandmother's apartment. Officer Dibley obtained Father's contact information from Mother and called him to pick up Z.D.G. The trial court granted DFPS's motion, and Z.D.G. was returned to foster care again.

On August 15, 2008, Father filed a motion for monitored return of Z.D.G. On September 26, 2008, the trial court granted his motion and returned Z.D.G. to his possession. However, in its order, the trial court specifically stated, "IT IS ORDERED that Respondent Mother, . . . shall have supervised visitation and access to the child, . . . arranged and supervised by the Managing Conservator [DFPS]. IT IS ORDERED that *[Father] shall not allow any contact between the child and the Respondent Mother[.]*" [Emphasis added.] Lewis testified that she talked with

---

[8] Officer Dibley described Mother as "very excited and she could not sit still. She could not concentrate on what I was saying. She would continually bounce from topic to topic to topic. . . . She was fidgeting a lot. She was asking for water. She had a really dry mouth." Officer Dibley testified that the symptoms of methamphetamine use are excitability, dry mouth, and foam ("little white stuff that comes right here out of your mouth") and that Grandmother demonstrated the same symptoms.

Father about this order and he stated that he understood. Mother's September 2008 drug test was positive for methamphetamine, and Mother admitted to Slife that she had relapsed badly.

On January 28, 2009, DFPS filed another emergency motion to modify possessory conservatorship because Mother had been providing childcare for Z.D.G. while Father worked—in violation of the trial court's order—and Father had no electricity in his apartment and was being evicted from it.  By the February 3, 2009 motion hearing, Father had been evicted and he and Z.D.G. had moved into a Budget Suites hotel.  The trial court granted the motion and Z.D.G. returned to foster care again, where she remained at the time the termination trial began in May 2009. The trial court also ordered Father to participate in a hair follicle and a urine sample drug screening.  Father complied with the urinalysis—which was negative for drugs—but he did not have enough hair on his head or body for the hair follicle test.

The trial court removed Father as temporary possessory conservator at the February 3, 2009 hearing, and he and Mother were to resume supervised visits at the CPS office.  Mother visited inconsistently; by the time trial started on May 18, Father had not visited Z.D.G. since March 30.[9]

### b.  Mother's History

_____

[9] According to Lewis, Father told her that he could not get off from work for the visits during the whole month of April.

Although Mother does not appeal the termination of her parental rights to Z.D.G.—she signed a voluntary affidavit of relinquishment and the trial court found termination to be in Z.D.G.'s best interest—we must review the evidence pertaining to her because Father placed or allowed Z.D.G. to remain with her. Sheri Maples had been the CPS worker assigned to a case involving Mother's two older children, R. and P.[10] Maples testified that in May 2006, DFPS received a report alleging that Mother and her paramour had been using methamphetamine in front of R. Mother was pregnant with P. at the time. After Mother gave birth to P., both children went into foster care, and Mother, P.'s father, and R's father were given service plans. P.'s father relinquished his rights to P.; R.'s father did not complete any of his service plan.

Maples testified that Mother completed parenting classes and a psychological evaluation but that she did not attend a lot of visits with the children, and when she did, she did not always behave appropriately.[11] Mother was arrested twice at the CPS office because she had outstanding warrants. Maples testified that Mother would frequently refuse to take urinalysis drug testing and that "[u]sually, [she] . . . was caught through hair strand testing." R.'s father "would end up in jail or they were fighting. There was a lot of domestic violence between the parents." Sometimes R.'s

---

[10] Father is not a parent of either of these children.

[11] Maples testified that at one particular visit, Mother "flew off in a rage" when Maples tried to stop the visit because Mother appeared to be about to spank a child.

12

father would refuse drug testing, sometimes he would fail to appear for the tests, and "one time, he . . . shaved all his body hair from the head all the way down, because . . . he was told that we were going to do the hair strand, so he shaved everywhere, and so when they went for the testing, they were not able to test him."

In October 2006, while her other two children were in foster care, Mother admitted to Maples that she was pregnant with Z.D.G. and that, if drug tested, she would test positive for methamphetamine and marijuana. Mother was living with Father at the time. Maples testified that, based on Mother's two drug tests in November 2006, she was concerned that Mother was continuing to use methamphetamine. Mother's January 2007 psychological evaluation included predictions that Mother was at high risk for continued drug use in the future and that small children in her care would be at high risk for abuse and neglect; it also noted that her responses suggested that she had longstanding psychological and substance abuse issues.

Mother lived with Father for around five months before she went into inpatient drug treatment in February 2007. She did not successfully complete the program and left treatment in March 2007. The trial court accepted her voluntary relinquishment of her parental rights to R. and P. in April 2007. Z.D.G. was born in May 2007.

Lewis testified that after Z.D.G.'s January 2008 removal, Mother told her that she and Father were separating and that she was moving in with Grandmother so

13

that Father would be able to get custody of Z.D.G. During this transitional period, on March 18, 2008, Arlington Police Corporal James Greenwell responded to a domestic disturbance at Father's apartment. Father reported that Mother assaulted him when she was moving some of her belongings. She left several long scratches on his forearm but left before the police arrived. Mother told Lewis that she and Father "had gotten into an altercation, that he pushed her in the chest, but that he didn't leave a mark, and [that] he knew how to do it where he didn't leave a mark." Slife testified that Mother claimed Father pushed or shoved her in the chest and that she knew Mother had scratched Father badly because she saw the scratches.

During Mother's May 24, 2008 encounter with Officer Dibley, the officer noticed that a vase had been knocked over and a picture frame had been shattered. Mother told her that the picture frame fell when she went to her room and slammed the door and that Grandmother picked it up and threw it at the door, shattering it. Officer Dibley testified that methamphetamine users can be very irrational and get very upset very quickly.

Slife testified that Mother told her that Father had been bringing Z.D.G. over on the weekends and that Father admitted to her that he had taken Z.D.G. to Mother's on numerous occasions. Lewis testified that after the May 24, 2008 incident, Mother told her that Father had been bringing Z.D.G. to her every weekend and that "she couldn't turn her child away on that particular day" because Z.D.G. was sick. Mother had taken Z.D.G. to the doctor earlier that day and provided Lewis with

14

the bill for x-rays because she needed CPS to pay it. Mother's contact with Z.D.G., unsupervised by CPS, was a violation of the court's April 17, 2008 order.

Slife testified that she often spoke with Mother on the phone about attending Narcotics Anonymous and counseling, drove Mother to visits with Z.D.G. four or five times, and offered to drive her to rehab. Slife said that she noticed when Mother was manic and "very up and down," but she did not see some of the other symptoms associated with cocaine or methamphetamine use.

Mother tested positive for methamphetamine and amphetamine via hair follicle testing and urine testing in September 2008. By March 2009, Mother was again encouraged to undergo inpatient drug treatment, but she did not go, and by trial in May 2009, Mother was pregnant again, although according to what Mother told Slife, this child was not Father's.

Mother signed an irrevocable affidavit of relinquishment of her parental rights to Z.D.G. before the termination trial. Lewis testified that she believed Mother's conduct had endangered Z.D.G. and that Father's allowing Mother ongoing access to Z.D.G. had endangered her, and she asked the trial court to terminate both parents' rights to Z.D.G. Slife also recommended terminating both parents' rights to Z.D.G.

### c. Father's History, Acts, and Omissions

Father's trial testimony pertaining to when he learned of Mother's drug problem is inconsistent—during his direct testimony, he stated that he started getting

15

suspicious that Mother had a bad drug problem when he "went to go take [Z.D.G.] home from the hospital," and that he did not know before the day Z.D.G. was born that Mother had a drug problem. However, during cross-examination, he testified that he became aware that Mother had a drug problem while she was pregnant with Z.D.G. because he visited her at the inpatient drug treatment center during that time.

Father was very angry about the February 2008 removal and told Slife that Mother must have been using drugs with Grandmother. Although he told Slife that Mother would never be high around the baby, Slife said that even before Mother's January 29, 2008 positive hair follicle drug test, she spent a lot of time talking with both parents about Narcotics Anonymous. She stated, "[Father] understood [Mother] needed to go." Slife also testified that she spoke with Father often about Mother's drug levels and drug use.

Slife testified that on March 12, 2008, when she explained to Father that Mother's drug tests were not only high, but higher than they previously had been, "he stated he had a suspicion that [Mother] was using; he just didn't confront her about it." Slife stated that Father always claimed that Mother "was a good Mom," and Father testified that he had only asked Mother about her two older children "in passing." He acknowledged that, in hindsight, he should have asked her to give him some details about why those children were in foster care but said that she

16

presented her story to him as "it wasn't her fault, it was pretty much her boyfriend's fault, and [he] left it at that" because it was something he "really didn't care about."[12]

Slife testified that Father consistently failed to understand why it was dangerous for him to allow Mother access to Z.D.G. When Z.D.G. was returned to Father in April 2008, the trial court specifically ordered that Mother could see Z.D.G. only during supervised visits at the CPS office. On April 22, 2008, Father told Slife that he did not understand why Mother's visits had to be supervised because he thought she was a good mom; "she would never, never use around the baby." Father testified that he had never wanted Mother to be supervised with Z.D.G.

When Z.D.G. was returned to Father in April 2008, he asked CPS for help paying for daycare. Although no subsidized daycare could be guaranteed, CPS was able to provide payment for weekday daycare for Father from April 23, 2008, until her removal on May 28, 2008. Father testified that he did not use Mother and Grandmother for weekend daycare but that his family worked on the weekends, so he "had various friends, personal friends that [he] would let watch [Z.D.G.]"—Doug, John, and Raymond.[13] Contrary to this testimony, however, he also stated that with regard to the May 24, 2008 incident, he had given Z.D.G. to Grandmother for Z.D.G.'s birthday because he had to work that weekend and Grandmother told him

---

[12] Officer Dibley testified that Mother told her that she had signed her two other children over to CPS because of her methamphetamine use.

[13] These individuals did not testify at trial.

17

that Mother was out of town.[14]  In contrast to Slife's testimony that he told her in February 2008 that Mother must have been using drugs with Grandmother, Father testified at trial that prior to May 24, he "had no idea whatsoever" that Grandmother may have been using drugs.

Slife stated that after the May 24 incident, Father "was extremely angry that [Z.D.G.] had been removed from day care at CPS and he told me he didn't know [Mother] had been using again and therefore he wasn't neglectful." Slife said that she specified to Father that he was putting Z.D.G. in danger with Mother, but that in September 2008, Father again asked her if Grandmother could watch Z.D.G. and if Mother could have access to Z.D.G. at that time—Slife told him no.

When Z.D.G. was returned to Father in September 2008, CPS resumed paying for daycare; at that time, Father was employed in building the new Cowboys stadium.  By January 2009, the subsidized daycare had expired.[15] Father testified that he knew he had disobeyed the court's order by letting Mother have access to Z.D.G. in January 2009, but he felt he had no choice "but to do that or lose [his] job" when he discovered that his subsidized daycare had been cancelled. However, Slife testified that in September and October 2008, she and Father talked numerous times about how he could apply for the subsidized daycare on his own.

---

[14] The jury also heard that at the September 17, 2008 hearing, Father said that he let Mother have Z.D.G.

[15] Lewis testified that daycare is usually set up in three-month increments.

Although in November 2008, Father told Slife that Mother would always be part of Z.D.G.'s life but never as a caregiver, by February 2009, Z.D.G. was removed again because Father had been allowing Mother to take care of Z.D.G. Father acknowledged that Mother's watching Z.D.G. was "not really" in Z.D.G.'s best interest, but he also stated, "I think it was in her best interest for [Mother] to watch her at my place and not at [Mother's] apartment." He stated that he had given Mother specific instructions that day to stay at his apartment "because knowing in the light that [Mother] takes her to the apartment that [Mother's] more prone to maybe falling or doing something not correct, you know, doing something stupid [like] . . . drugs." He testified that Mother had to follow his instructions "so we don't get busted."

Mother admitted to Slife in early January 2009 that she had been watching Z.D.G. for Father again. On January 26, 2009, Mother called Slife: "She was hysterical, and she was screaming that [Father] was being evicted, he didn't have any electricity in his home, and she was worried about him watching [Z.D.G.] with no electricity, so she had watched her."

Father testified that on a parenting scale of one-to-ten, Mother would be an eight for Z.D.G., describing her as follows,

> When she was living with me and when I was working both jobs, . . . the way she took care of her daughter was that of—that I've actually never seen with both my other moms. She would always have a bottle ready for her. When she woke up, [Mother] would walk with her until she fell asleep, she would rock her to sleep, she would play with her, she would

19

do normal things that a mom, I think she would go above and beyond what a mom would do. And that's just from a dad's point of view. . . . *Just the two from the ten being the part she's on drugs would be the bad, would be the two minus her being a ten.* [Emphasis added.]

On cross-examination, he gave the following testimony:

Q. Okay. How many times does—in your mind—does [Mother] need to test positive for drugs, assault you, have the police go to her home and find drug paraphernalia there? How many times does that have to happen before you decide this is not someone that I should allow my child to be with?
    I'm looking for a number, not an explanation.

A. I guess a number probably should be number one.

Father testified that he only once knowingly violated the trial court's order with regard to Mother's access to Z.D.G., in January 2009. Slife stated that she knew of no incidents, other than on May 24, of Mother's having possession of Z.D.G. while under the influence of drugs. Slife testified that Father had stated to her that, in his opinion, letting Mother have access to Z.D.G. was in Z.D.G.'s best interest.

Father also had his own drug history. He was on deferred adjudication community supervision for a 2003 possession of a controlled substance offense.[16]

---

[16] Father described the events surrounding the offense:

One night I was partying with some friends and we went to this party and there were other people there. It had gotten late, and I had been drinking a few beers, maybe a couple of shots, too, and we had taken off, and I was in the passenger side, I was letting somebody else drive, and we had gotten pulled over. One of the guys I had met that evening was, I guess, had a warrant for his arrest for some traffic tickets or whatever I can remember at that time, and they pulled him out. They pulled me out, wanted to search the car. Go ahead. Search the car. I've got nothing to hide. And that's when they had found a bag of

At trial, he testified that the last time he used an illegal drug was cocaine on the date of his arrest in 2003. However, the jury also heard that he had previously testified at the September 17, 2008 hearing that the last time he used cocaine was in the 1990s. Father presented a certificate of completion of supportive outpatient treatment for drugs dated June 28, 2006, to show compliance with his community supervision.

Most of the testimony at trial indicated that Father consistently refused to take drug tests requested by CPS. Father did not complete any drug tests for CPS between May 28, 2008, and January 2009. Father's continued objection to submitting to drug testing at CPS's request was that it was not court-ordered and therefore violated his right to privacy.[17]

Father testified that he did not have time to go take a drug test every time a CPS worker asked him to and that the first judge in the case ordered his drug tests to be obtained from his probation officer. Cumberbatch testified that, in the beginning, Father did not want to sign the release of information about his drug tests from his probation officer. She testified that she never actually saw Father's drug tests but just "took the probation officer's word for it." Lewis testified that all the

---

cocaine on my side of the—bag of cocaine on my side of the car, and what can I say then? I mean, I had to take the blame.

[17] Lewis testified that CPS does not usually have to get a court order to have a parent drug tested because "[p]arents typically will comply if they're clean."

probation officer would give her was the results of the tests, but she acknowledged that there was no evidence of Father's using illegal drugs since DFPS filed the case.

Slife testified that Mother told her that Father "was able to beat his probation-ordered [urinalysis tests] by not going in as soon as he was called by the [probation] officer."[18] Father testified that he did not know how one would fake a drug test and that he never told Mother that he knew how to do that. He also testified that when his probation officer tells him to take a drug test, he has twenty-four hours to go take the test if the request is made after 3 p.m., and that if it is before 3 p.m., he is supposed to go take it right then. He added, "Well, usually, I take time off from work to go see my probation officer, and if she tells me to go take a test, which usually she does, there are times she doesn't, but I'll take that time, because I don't have time to take off from work, and I'll go right after." He also testified that he knows a month in advance when his next meeting with his probation officer will occur because she does all of the scheduling, and that of the urinalysis drug tests he has been given over the five years of probation, only six or seven tests were totally random.

Fortner testified that any hair can be used for a hair follicle test, as can fingernails, but that body hair, including facial hair, grows much slower than head

---

[18] Fortner, the toxicologist, testified that, in comparison to hair follicle testing, which shows a ninety-day history, a urine test is "really a snapshot in time." That is, of all the samples, besides blood and oral fluids, urine has the shortest window—"From single uses, generally it's about 72 hours at best that we can detect drug use in urine."

hair, so the window for estimating drug use expands from ninety days to up to a year. Father testified that he had been shaving his head since 1999 and started shaving his body hair a few years after that when he started training; he shaves his head because he is balding. He attributed his fingernail and toenail trimming to staying "well-groomed," and he stated, "Absolutely not," when asked whether he had been shaving in an attempt to avoid drug tests. Fortner opined that if Father had quit shaving his head on February 3, 2009, he would have been able to complete a hair follicle test by the start of trial on May 19, 2009.[19] Father testified that after Z.D.G.'s final removal in January 2009, he "reassured [Lewis] and asked her to give [him] a drug test every week, every day, [to] which she said no, she wouldn't do that because [he] would be prepared for it or something like that."

Father's May 25, 2007 urine test was admitted—it showed a positive result for hydrocodone, a semi-synthetic prescription narcotic synthesized from codeine. However, Fortner testified that Father's hydrocodone level was not elevated to any extent that he would consider a form of abuse, as opposed to Mother's drug levels, which were "extremely high." Father testified that he was taking hydrocodone at the time for a groin injury that he had surgery for. Slife testified that Mother told her in August 2008 that Father was trying to get hydrocodone from her, and that the first

---

[19] Lewis acknowledged that CPS had never asked the trial court for an order that Father grow hair to take a hair follicle test. Slife acknowledged that Father had a goatee and that, as far as she knew, no hair follicle sample had ever been taken from it. There was no testimony about whether the goatee contained a sufficient quantity of hair—forty milligrams—for testing.

23

she had heard about Father having a prescription for hydrocodone was in January 2009.

Father's attempted hair follicle drug test from June 2007 was admitted. It reflects that Father did not have any fingernails, toenails, or hair on his head or body that could be cut to send off for a lab test, so the test could not be performed. The representative from the testing company stated that if a person says he has no body hair, "[w]e can't just take their word for it. We have to pull them in the back room and see for ourselves."[20] Father testified that he was "[a]bsolutely not" taking drugs at the time.

Generally, Father was uncooperative in his dealings with CPS. Cumberbatch testified that Father did not want to allow CPS access to Z.D.G., that his physical behavior was very intimidating, and that he was insulting, tried to provoke arguments, and used profanity. Slife testified that Father was sometimes verbally abusive to her and to the CPS worker—"he would yell very, very loudly, he would get in your face, he would curse occasionally. There was a time I felt intimidated by him

---

[20] Father testified, "They looked. They didn't go into detail, but they pretty much told me to pull up my pants and my shirt and I offered to go further, but they said no, that's okay, they didn't need me to."

at the visit, and at the next visit, he and I talked about that."[21]  She also testified

about an incident on September 23, 2008, when

> I was having trouble figuring out where [Z.D.G.] was in day care, and
> it was very important for me to figure out if she was with [Mother] or in
> day care, so I called [Father] and asked him where she was going, and
> he wouldn't give me that information.  I asked him repeatedly for the
> information, and he asked me did I have a pen and paper, and I said
> yes, I'm ready to write the name down, and he said, well, then I have 25
> names for you to figure that out. What I'm going to do is send her to a
> different person every day, and every day you can just call one of these
> 25 people and figure out where she is.

He never gave her the twenty-five names.

At some point, Mother expressed to Lewis that she was afraid of Father, that

he used more drugs than she did, and that he had threatened her.  In March 2008,

Mother told Slife that she was worried about the level of care that Father would

provide and that she thought Father needed to be in anger management because

"he had a temper, he was very controlling, he intimidated her, and it scared her."  In

September 2008, Mother expressed to Slife that she was very sad "that she wasn't

going to be there to protect [Z.D.G.] from [Father]" and that she was terrified about

---

[21] Slife stated,

> I allowed [Father] to call my house whenever he was having trouble
> with CPS, and he always knew he could call and vent, and he did that
> often when he was very frustrated.  He would be very upset, and as
> long as it wasn't directed at me, it didn't bother me, so I let him call.  I
> talked to him numerous times about how [Mother] was doing, thought
> it was important that he understand her emotional state and some of
> the drug tests so that he would know that she wasn't doing as well as
> he thought.

the court giving Z.D.G. back to Father. Father testified that he sued Mother for custody of Z.D.G. because she started telling lies about him.

Father testified, "What I am feeling since day one is that of pure harassment. Pure harassment from CPS, when this fight was originally with [Mother] and not with me. When they came and took my child, I made it my fight." He stated that he did not give CPS any birthday gifts for Z.D.G.'s second birthday "[b]ecause her gifts are for when she's at the house. We don't celebrate at an enemy's place." With regard to his relationship with CPS from the beginning, "It's been war."

Father testified that he would "never put [Z.D.G.] in danger in any way ever knowingly." With regard to leaving Z.D.G. with Mother, his drug tests, and his lack of cooperation with CPS, he gave the following testimony during Z.D.G.'s ad litem attorney's cross-examination:

> Q. So, then, let me try to summarize what I believe your answer was in the fact that they [CPS and DFPS] brought this lawsuit to begin with and have infringed on your rights, your personal rights, [Father's] personal rights, and since they've infringed on your rights and they really haven't been cooperative with you, you've been uncooperative with them?
>
> A. That is correct.
>
> Q. That is? So that's the principle? That's what you're trying to validate by saying no, I'm not going to take a test is because you violated my rights, you've been uncooperative with me and so I'm going to be uncooperative with you?
>
> A. That's been the case, yes, sir.

Q. Okay. And is that more important than your child? Is that principle you're trying to accomplish more important than [Z.D.G.]?

A. What is important is my daughter, and like I've said, I've always done everything I could in my power for that reason.

. . . .

Q. Wouldn't you agree with me that taking a hair follicle test or a fingernail test, since you're clean and you could get your kid[] back, and although you have this principle of not doing it, that the reward, that the goal would be justified if [Z.D.G.] were your number one priority?

A. [Z.D.G.] was taken away from me because I messed up. *I gave [Mother] [Z.D.G.]*, okay? My drug tests, Brad, 20 or more from the past, as of recent, speak for themselves. If I'm doing drugs, I'm sure those—in fact, one did come up positive for hydrocodone, okay? If I was trying to mask it or trying to do anything of any kind of sort of way, I'm sure it would have been—that would have been negative, too.

Q. I understand that, [Father], and I understand your—

A. Then why are you asking me to change my lifestyle?

Q. I'm not. I'm just saying, when you get the scales and you're going to weigh the balance, what's more important, me taking—me taking a drug test that I don't think I should have to submit to or getting my little daughter back? That's my question.

A. Brad, as I stated before, this fight has never been with me; it's been with my ex, okay? They made this fight with me. They are the ones harassing me, asking me why do I have to grow my hair back? And I will do it by court order, no problem, and I have respected that when the judge has asked me to do that. . . . [Emphasis added.]

There was also testimony at trial about Father's finances and employment.

At the beginning of the case, Father worked on commission as a personal trainer at

a Gold's Gym owned by his brother. Father then took on additional part-time work,

and later full-time work, sorting mail before giving up personal training entirely when the recession started affecting his customers.[22] In March 2008, Mother told Slife that Father had been fired from his job,[23] that he asked her for money because he was behind on his rent by a month and a half, and that he often asked her for money and diapers. In June 2008, Mother told Slife again that Father called her seeking financial assistance.

By September 2008, Father was working for Crown Corr, building Cowboys Stadium; he testified that he had been promoted to foreman.[24] Father attributed his eviction to

> a couple of disputes over a couple of bills that [he] had, that really, to sum it up, it was a total collapse of everything that was occurring for the past couple of months before that, prior to the actual date of eviction. Pretty much falling victim—I'm not a guy that likes to give excuses, but falling victim to, I guess, today's recession.

---

[22] Father stated,

My hours of sleep . . . was six in the morning until about 11 o' clock in the morning where I would start working at Gold's Gym from about 11 until about eight or nine, and then . . . when I worked nights from 12 till about eight in the morning, sleep from eight in the morning until about 11, and then I would work almost full-time. I started full-time with them from about 12 o'clock until seven.

[23] Father testified that he "pretty much quit" after working two full-time jobs for around four months.

[24] Lewis testified that parents have the responsibility to provide CPS with documentation of income and employment and that, although she had requested pay stubs from Father numerous times, he never provided any and she was unable to verify his employment.

He stated, "This is something I know I could have taken care of, but I just couldn't because I just didn't have the funds available." Father also admitted that he was in arrears in his child support for one of his other two children by fifteen months or more.

Lewis acknowledged that when Z.D.G. lived with Father, he provided clothes, food, and a room for her to sleep in, and everything in the home seemed appropriate. Slife found a toddler bed for Z.D.G. for his apartment. However, when Z.D.G. returned to foster care, Father failed to provide her shot records to CPS,[25] and the last time she went into foster care, Z.D.G. was sick and had to go to the doctor.

### 2. Analysis

In his first, second, third, and fifth issues and in part of his twelfth issue,[26] Father contends that the evidence was legally and factually insufficient to terminate his parental rights on endangerment grounds. Specifically, he argues that there was no proof that Z.D.G. was ever in danger when he allowed Mother to have access to her or that Mother's conduct ever placed Z.D.G. in real danger during those occasions. He refers to evidence that Mother's access to the child was supervised

---

[25] Slife testified that Father did not keep up with Z.D.G.'s immunizations—Z.D.G.'s fifteen-month shot was due when Father had possession and Slife brought him the WIC card and Medicaid information from the foster home so that he could get it taken care of.

[26] Father challenges the denial of his motion for directed verdict, which is a legal sufficiency challenge.

by Grandmother "during one or more of her periods of unsupervised access" and complains that no witness was able to tell the jury "exactly what danger, if any, the child was actually presented with."

As noted above, however, "endangerment" means to expose to loss or injury—actual loss or injury is not required to support an endangerment finding. *See Boyd*, 727 S.W.2d at 533; *J.T.G.*, 121 S.W.3d at 125. And Father neglects to account for the endangering environment and conduct that occurred before Z.D.G.'s birth, as well as after. *See D.M.,* 58 S.W.3d at 812; *W.A.B.*, 979 S.W.2d at 806–07; *see also S.K.A.*, 2009 WL 2645027, at *9. That is, the jury heard testimony that Mother used drugs—methamphetamine, marijuana, and cocaine—while she was pregnant with Z.D.G. Dr. Scroggins testified that cocaine can be fatal to a baby—specifically, that it

> can cause abruption of the placenta, separation of the placenta from the walls of the uterus which ends the baby's blood supply and can be fatal. That's the biggest concern. We're also concerned about stunting of the baby's growth, and we never know what cocaine may be cut with or what other contaminants may be involved with it.

The jury could have reasonably formed a firm belief or conviction that Father knew about Mother's drug problem because Mother was pregnant with Z.D.G. and living with him for several months when she used drugs, because he visited her during her inpatient drug treatment while she was pregnant with Z.D.G., and because she tested positive for cocaine on April 30, 2007—fifteen days before Z.D.G.'s birth.

30

Notwithstanding Mother's endangering environment and conduct before Z.D.G. was born, even if Father believed Mother was no longer using drugs during the six months or so that he and Mother had possession of Z.D.G., the jury could have reasonably concluded that when Mother's January 29, 2008 hair follicle test resulted positive for cocaine, Father was on notice that Mother's drug problem had resurfaced. And the jury could have concluded that even if Father was completely unaware of Mother's and Grandmother's drug use up until that point—in spite of Mother's positive January and February 2008 drug tests and Slife's statement that Father said in February that he thought Mother must have been using drugs with Grandmother—by the time Mother went on a drug binge with Grandmother in May 2008, Father must have thereafter known of the danger to Z.D.G. of placing her with drug users. And with regard to the last time that he left Z.D.G. with Mother, in January 2009, his own testimony that he had given Mother specific instructions to stay at his apartment because if she took Z.D.G. to her apartment, she might "do[] something stupid [like] . . . drugs," acknowledges his awareness of the risk to which he subjected Z.D.G. The jury could have chosen to disbelieve Father's statement that he would never knowingly put Z.D.G. in danger in any way.

The jury had the task of determining which witness to believe with regard to whether Father knew about Mother's drug use and whether he knew her drug use could be dangerous to a toddler—Father, who contradicted himself on more than one occasion during his testimony, or the CPS workers, the CASA worker, Officer

31

Dibley, the toxicologist, and other witnesses. *See H.R.M.*, 209 S.W.3d at 108; *see also W.S.*, 899 S.W.2d at 776. Based on the entire record—including the fact that the jury could have interpreted Father's repeated refusals to take drug tests for CPS and his head and body hair-shaving as an indication that he was also using illegal drugs—we conclude that the evidence is legally and factually sufficient to uphold termination of his parental rights on the basis of endangerment. *See* Tex. Fam. Code Ann. § 161.001(1)(D); *J.P.B.*, 180 S.W.3d at 573; *C.H.*, 89 S.W.3d at 28; *cf. Smith v. Tex. Dep't of Family & Protective Servs.*, Nos. 01-09-00173-CV, 01-09-00390-CV, 2009 WL 4359267, at *8 (Tex. App.—Houston [1st Dist.] Dec. 3, 2009, no pet.) (mem. op.) (indicating that a factfinder may infer from a refusal to take a court-ordered drug test that parent was using drugs). We overrule Father's first issue and the part of his twelfth issue addressing endangerment. Based on our resolution of Father's first issue, we need not also address his second, third, and fifth issues. *See* Tex. R. App. P. 47.1; *In re E.M.N.*, 221 S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.).

**C. Best Interest**

In his fourth issue and part of his twelfth issue, Father argues that the evidence supporting the jury's best interest finding is legally and factually insufficient. In his sixth, seventh, eighth, ninth, tenth, and eleventh issues, he attempts to build upon this argument, contending that DFPS failed to take all steps reasonably necessary towards the goal of family reunification while he worked diligently towards

32

achieving that goal, that his own conduct was not dangerous to Z.D.G., that DFPS's "inaction with regards to providing the CCMS funding for daycare was the proximate cause of the January 2009 un-supervised access of . . . [Mother] with the child," and that he acted with Z.D.G.'s best interest in mind when he allowed Mother access to her in January 2009.

### 1. Standard of Review

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (Vernon 2008). Among others, the following factors should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment: the child's age and physical and mental vulnerabilities; the frequency and nature of out-of-home placements; the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; and whether an adequate social support system consisting of an extended family and friends is available to the child. *Id.* § 263.307(b); *R.R.*, 209 S.W.3d at 116.

Other, nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(A)     the desires of the child;

(B)     the emotional and physical needs of the child now and in the future;

(C)     the emotional and physical danger to the child now and in the future;

(D)     the parental abilities of the individuals seeking custody;

(E)     the programs available to assist these individuals to promote the best interest of the child;

(F)     the plans for the child by these individuals or by the agency seeking custody;

(G)     the stability of the home or proposed placement;

(H)     the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)     any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

**2. Analysis**

By the time trial began, Z.D.G. was two years old and had been placed into foster care four times. Slife testified that Father was adamant in refusing family

34

counseling between him and Mother, and his refusals to CPS's requests for drug tests and his general recalcitrance are thoroughly discussed above. Father testified that his local support system consists of his immediate family—father, brother, and sister—but that he has a large extended family in Chicago. *See* Tex. Fam. Code Ann. § 263.307(b); *R.R.*, 209 S.W.3d at 116. He planned to raise Z.D.G. in his family's religion, Greek Orthodox.[27] He also testified that he had been seeing someone for about four months, that it was "pretty serious," that she was not a drug user, and that he had never discussed whether she had used drugs in the past.

Father testified that he believed "the mom and the dad should raise their children, period. That's the way [he] was brought up, and that's it." He testified he would raise Z.D.G. by himself, and that if he were to be appointed sole managing conservator, Mother would not have access to Z.D.G. at all. He described his plan for raising Z.D.G. as,

> Well, first and absolutely foremost is get her stabilized. She needs to be attached to her dad, not to her first foster family, her second foster

---

[27][▲] Cumberbatch stated that when she placed Z.D.G. with Father and Mother, neither told her anything about any religious observances that they wanted DFPS to consider and that this was not brought up at any point while Z.D.G. was in foster care.

Father testified that Z.D.G.'s hair was cut without his permission, that the first time a Greek Orthodox child's hair is cut is when she is first baptized, and that he told the CPS worker "specifically what her—what she could and could not do, and especially the hair." He stated that he "asked CPS and everybody and to whom it may concern, [and] that strictly what I wanted for [Z.D.G.] was not even mentioned to [the foster parents] is disturbing and it's shocking, and I feel violated because of that." Lewis testified that Z.D.G.'s hair was cut with Mother's permission.

35

family. She needs to be attached to Dad, and once Dad gets established and all this cloud and rain is gone, then and then, once she will be grown up, as I was grown up, as roots go deep with me here, she will have, I plan on her going to college here, I plan on teaching her more country dance moves. I used to teach country dancing, and we did dancing all the time. We did our stuff where, your typical dad stuff where you put her on your back. What she needs right and foremost, being two years old, this solidarity, and that's what I plan on giving her.

He testified that he had two different babysitters lined up to provide daycare for Z.D.G. and two other daycares in mind if either of them should fail.

Father also testified about his two other children—a five-year-old (J.) and a sixteen-year-old (C.). He testified that he sees them when he can—he last saw J. five months before trial. He does not have a child support order to pay support for J. He gave the following testimony on cross-examination about J. and C.:

Q. [H]as there been a period of time in [J.'s] or [C.'s] li[ves] when you have gone several months with no contact with them, without seeing them in person?

A. Yes, ma'am.

Q. Why is that?

A. Mom would disappear. Mom goes—she has, her job consists of going out of town a lot, so she's out of town a lot.

Q. Have you filed any motions in court to get custody of [J.] or [C.]?

A. No, not at the time. Usually she would let them—

Q. I mean ever. Ever.

A. For me to take over rather than her?

36

Q. Yeah.  Because she keeps running off with them.  Have you ever filed?

A. We have an understanding.

Q. You have an understanding?

A. Yes, ma'am.

Q. That she can run off with them for months at a time?

A. Yes, ma'am.

Father testified that he sees C. once a month, and he has been under a court order to pay child support for C. since 1994.  He admitted that he was in arrears in his child support for C. by fifteen months or more.

Father testified that he was educated in automotive technology and, at the time of trial, worked for Crown Corr, one of the companies involved in constructing Cowboys Stadium.  Father testified that he had recently been promoted to foreman at his job, that, although the stadium would be finished in June, there would still be work there through the preseason, and that Crown Corr had three or four other projects opening up in the area.  He testified that his union provided insurance, a pension, and a 401(k), and that he planned to move in with his brother temporarily until he decides where to build a home.

Father had testified that his contingency plans prior to the date of eviction were to either move in with his brother, who has a five-bedroom house, or to move

into an extended stay hotel. By the time of trial, he was still living at Budget Suites.

He explained,

> I'm just waiting for this whole thing to blow over. Once this blows over, I will, like I said, I'm still entertaining different things I want to do as far as my housing is concerned. It's kind of hard, as I've learned, that once you get an eviction on your record, it's kind of hard to get another apartment. Actually, it's kind of quite hard, but until everything, I get everything settled with that as far as Court and then my disagreements with my bills with them, then I have to stay here temporarily, and I've been talking with my brother extensively here in the past couple of months since [Z.D.G.] has been taken from me that once all this is gone, I will be moving in with him on a temporary basis.

Lewis testified that DFPS's plans for Z.D.G. were for her to be adopted by her current foster family. Z.D.G.'s foster mother testified that at the time of trial, Z.D.G. and one other foster child lived with her and her husband, that they could not have children, and that they became dual-licensed for foster care and for adoption because they wanted to adopt. The foster mother testified that she and her husband wanted to adopt Z.D.G., stating, "We have a home for her. We love her very much. She's very dear to us, and we would love to have her stay with us." Z.D.G.'s foster mother also gave the following testimony:

> Well, I think that we can provide for the basic needs of a growing toddler. We can give her a feeling of being safe and secure. We're financially stable, so if she were to stay with us, she would always know that there would be a home, a safe place, just family-oriented activities. We would be able to provide her with moral and spiritual guidance, basic needs like a room, clothing, food, unconditional love. She just would have the support of our friends and our family members who have already met her and love her.

38

She testified that her husband is a mechanic for American Eagle, that she has an associate of arts degree and has been a substitute teacher, and that she currently works part-time doing accounting and payroll.

Z.D.G.'s foster mother testified that Early Childhood Intervention ("ECI") came out three times a month to provide Z.D.G. with therapy to help increase her vocabulary because "[s]he wasn't using very many words whenever she first came into our home, but through the techniques we've been using that ECI has recommended, she's probably tripled her vocabulary at this point, and she's gone into putting together two- and three-word sentences." Father testified that he was never offered ECI services when Z.D.G. lived with him.

Contrary to Father's arguments in his sixth through eleventh issues, as set out above, the record is replete with Slife's descriptions of the assistance that she provided to both parents and CPS's efforts to promote family reunification, as well as with testimony about Father's own endangering conduct. Furthermore, the jury could have chosen to believe Slife's testimony about discussing Father's need to apply directly for subsidized daycare months in advance, rather than Father's testimony that he did not realize that the subsidy would end until it ended. Although Father complains that CPS failed to complete home studies for placement of Z.D.G. with relatives, the record reflects that home studies were conducted on Father's

39

brother and his mother.[28]  The jury was apprised that these home studies had not been updated since 2007 but also that in September 2008, CPS was still hoping for family reunification and seeking names from Father for home studies.  And the jury could have believed, based on the testimony about Mother's erratic and dangerous behavior—manic behavior, domestic disturbances, and drug use—that Father did not act in Z.D.G.'s best interest when he allowed Mother access to her in January 2009.

Reviewing the evidence in the light most favorable to the finding and the judgment, and assuming the jury resolved any disputed facts in favor of its finding if it could have reasonably done so, we conclude that the jury could reasonably have formed a firm conviction or belief that termination of Father's parental rights was in Z.D.G.'s best interest.  *See* Tex. Fam. Code Ann. § 161.001(2); *J.P.B.*, 180 S.W.3d at 573.  Therefore, we conclude that the evidence is legally sufficient, and we overrule the remainder of Father's twelfth issue.  And in light of the entire record, we also conclude that the evidence was factually sufficient, and we overrule Father's remaining issues.  *See* Tex. Fam. Code Ann. § 161.001(2); *H.R.M.*, 209 S.W.3d at 108.

### III.  Conclusion

---

[28] CPS determined that Father's brother would not be able to provide care for Z.D.G. because of the hours that he worked.  Lewis testified that Arizona CPS and Texas CPS denied Father's mother "because there were allegations of sexual molestation of [Father's] sister by the stepfather."  Lewis testified that she was not aware of whether the stepfather still lived with Father's mother.

40

Having overruled Father's dispositive issues, we affirm the trial court's judgment.

PER CURIAM

PANEL: MCCOY and MEIER, JJ.; and DIXON W. HOLMAN, (Senior Justice, Retired, Sitting by Assigment).

DELIVERED: June 10, 2010